UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

JONATHON MICHAEL KING                                      PLAINTIFF

v.                                              CIVIL ACTION NO. 3:13-CV-698-DW

CAROLYN W. COLVIN, Acting Commissioner of Social Security            DEFENDANT

## MEMORANDUM OPINION

Plaintiff Jonathon Michael King has filed a complaint pursuant to 42 U.S.C. §405(g)  to

obtain judicial review of a final decision of the Commissioner of Social Security that denied his

applications for disability insurance benefits (DIB) and supplemental security income (SSI).

King applied for DIB and SSI on March 22 and 26 2010, respectively, alleging that he was

disabled as of August 27, 2006, due to Crohn's disease, arthritis, anxiety and depression (Tr. 61,

139-40; 62, 141-44).  The Commissioner denied King's claims on initial consideration (Tr. 61-

62, 63-64) and on reconsideration (Tr. 86-88, 89-91).  King requested a hearing before an

Administrative Law Judge (ALJ) (Tr. 92-93).

ALJ Mark Siegel conducted a video hearing from Knoxville, Tennessee, on Jan. 24, 2012

(Tr. 32-60).  King attended with his attorney, Alvin Wax (Tr. 32).  King and vocational expert

(VE) Jo Ann Bullard testified at the hearing (Tr. 38-56, 57-60).  Following the conclusion of the

hearing, ALJ Siegel entered a hearing decision on Feb. 7, 2012, that found King is not disabled

for the purposes of the Social Security Act (Tr. 19-27).

In his adverse decision, ALJ Siegel made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act
       through Sept. 30, 2010.

2.     The claimant has not engaged in substantial gainful activity since Aug. 27, 2006,
       the alleged onset date (20 C.F.R. 404.1571, *et seq.* and 416.971, *et seq.*).

3. The claimant has the following severe impairments: Crohn's disease and cervical degenerative disk disease (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than a full range of light work. He is limited to occasional postural activities. He can only frequently reach, handle or finger with his left hand.

6. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7. The claimant was born on March 8, 1978, and was 28-years-old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8. The claimant has at least a high-school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled. (20 C.F.R. Part 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from Aug. 27, 2006, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. 21-26). King sought review of the hearing decision by the Appeals Council (Tr. 15). The Appeals Council denied his request for review, finding no reason under the Rules to review ALJ Siegel's decision (Tr. 1-6). The present lawsuit followed.

**The Five-Step Sequential Evaluation Process.**

Disability is defined by law as being the inability to do substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See, 20 CFR §§ 404.1505, 416.905(a).  To determine whether a claimant for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed.  20 CFR §§ 404.1520, 916.920(a).  At step 1, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the claimant to be not disabled.  See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971.  *See, Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of the evaluation process whether the claimant has a severe impairment or combination of severe impairments that significantly limit his or her ability to perform basic work activities.  See 20 CFR §§ 404.1520(a)(4)(ii),  416.920(a)(4)(ii).  If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant will be determined to be not disabled at step 2.  *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart B of Part 404 of the federal regulations.  20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be automatically disabled without consideration of his or her age, education or work experience if

the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix. *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work. 20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989). A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3) The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who cannot return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience. See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999). Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."

**Standard of Review.**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g). The statute, and case law that interprets it, require a reviewing court to affirm the findings of the Commissioner if they are supported by substantial evidence and the Commissioner has employed the appropriate legal standard. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528

(6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.).  Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*).  It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000).  So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion.  *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th Cir. 1989).  The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

**Background Information.**

Claimant Jonathan Michael King was born March 8, 1978 and was 28 years old at the time of the hearing decision of Feb. 7, 2012 (Tr. 139).  He stands 5' 8" tall and weighs 180 lbs (Tr. 501).  King is a high school graduate and holds an associate degree in computer networking

from Sullivan College (Tr. 39). He is divorced, lives with his parents, and has not worked since 2006 (Tr. 38-39, 490). His most recent employment was as a retail clerk in a video store where he worked for one and a half years. Prior to that job, King worked as a laborer in a warehouse (Tr. 57, 491).

In the early1990s, King was diagnosed with ulcerative colitis (Tr. 328, 331). His symptoms at that time were well controlled with no weight loss, bloody stools or hematemesis or melena (Tr. 326).[1] Medical records from the late 1990s indicate only minor flare-ups of abdominal pain at the time, which occurred well prior to his alleged disability onset date of Aug. 27, 2006. (Tr. 323, 326). King was then treated with Asacol, 1200 mg. TID, Niferex, 150 mg. QD, Nexium, 40 mg. QD, and folic acid, 1 mg. QD.

Office treatment notes of Dr. Donna Volk, a pediatric gastroenterologist, indicate that King was diagnosed with Crohn's disease, rather than ulcerative colitis, beginning in the fall of 1999, after King made complaints of progressive weight loss (Tr. 279-80). Dr. Volk increased his Asacol medication to three, 1200 mg. tablets daily (Tr. 279). She also prescribed Remicade infusion[2] as well (Tr. 278). At that time, King reported that he was much improved with a decrease in abdominal pain, improvement in his appetite, and a weight gain of 7 lbs. Dr. Volk indicated in her office treatment note of Oct. 5, 1999, that King appeared to be "much improved at this point in time…." (Id.).

---

[1] Hematemesis is the vomiting of blood, which may be obviously red or have an appearance similar to coffee grounds. Melena is the passage of black, tarry stools." (http://www.ncbi.nim.nih.gov\books\NVK411\ )(last visited Feb. 3, 2014)).

[2] Remicade is an IV administered medication used to treat rheumatoid arthritis, Cronhn:s disease, ulcerative colitis and chronic plaque psoriasis by blocking the actions of tumor necrosis factor alpha in the body to decrease inflammation by weakening the immune system. (http://www.webmd.com/drugs/drug-16554-Remicade+IV.aspx?drugid=16554& (last visited Feb. 6, 2014).

Two years later in July of 2002, King returned to Dr. Volk. At that time, the doctor reported that King was "doing quite well and does not have abdominal pain." (Tr. 277). His physical examination on that occasion was normal, and his Crohn's disease was noted to be in remission (Id.). His medications continued to be Asacol, 800 mg. TID, Nexium, 40 mg. QD, and folic acid, 1 mg. QD (Tr. 277). His return visit to Dr. Volk the following year on Feb. 25, 2003, also was unremarkable (Tr. 276). King denied any abdominal pain, vomiting or diarrhea. His appetite was noted to be excellent, and he had gained 3.25 lbs in the preceding six months (Id.). His Crohn's disease remained in remission throughout 2003.

Unfortunately, in September of 2004, King developed increasing abdominal pain, tenderness in his lower right abdomen, and complaints of diarrhea (Tr. 274). Dr. Volk concluded King was experiencing a recurrence of his Crohn's disease and increased his Asacol medication (Tr. 274). Endoscopy confirmed the presence of gastritis and esophagitis, along with chronic colitis, as well (Tr. 273). Dr. Volk switched King's medication from Asacol to Colazel, three 750 mg. capsules TID, and prescribed Cipro, an antibiotic used to treat acute flare-ups of Crohn's disease (Tr. 273). This treatment change resulted in King's Crohn's flare-up coming under "good control." (Tr. 271). Dr. Volk continued treatment with Colazel, Niferex and Nexium (Id.).

Beginning in early 2007, after King's alleged disability onset date, he began to complain of chronic headaches, accompanied with light sensitivity, or "photophobia." (Tr. 238-240). King related at the time that he was experiencing such headaches 2-3 times a week, and that they "cause[d] him to loose approximately 4-8 hours of working time." (Tr. 238). Neurological examination at the time, however, was noted to be within normal limits (Id.). On Aug. 24, 2007, King was treated at Norton Audubon Hospital for severe headache (Tr. 305-309). His blood

pressure on that occasion was measured at 160/122 (Tr. 305). A CT scan of King's head, performed without contrast, showed no midline shift, mass effect or intracranial hemorrhage (Tr. 308). . The ventricles and sulci were noted to be within normal limits, as well. Accordingly, King was diagnosed with headache due to elevated blood pressure and released within three hours following his initial examination (Tr. 306, 308). Four days later, King returned to his treating physician, Dr. Sparks, who noted that he "was in his normal state of health until he went to the hospital on Aug. 24, 2007, with a severe headache." (Tr. 235). King was noted to have malignant high blood pressure, and reported that he was given IV vasodilators to lower his blood pressure. A prior MRI of King's brain obtained several months earlier in June of 2007, likewise had proved to be unremarkable for an individual of King's age (Tr. 230). About this same time in mid-2007, King's blood count levels became abnormal (Tr. 237). King was diagnosed with thrombocytosis[3] secondary to his Crohn's disease (Tr. 236-237

In September of 2007, he was diagnosed with hypokalemia[4] related to diarrhea caused by his Crohn's disease (Tr. 234). Due to King's hypokalemia, Dr. Sparks referred him to Dr. Charles Webb, a blood disorder consultant (Tr. 225-226). Dr. Webb's treatment notes of July 26, 2007, reflect King's complaints of persistent headaches and his abnormal blood count numbers (Id.). At the time, King was being treated for his Crohn's disease with Colazal, 750 mg., 3 tablets TID, folic acid 1 mg. QD, Lexipro, 10 mg. QD, and Protonix, 440 mg. daily (Tr. 226). Other than headaches and "some problems with chronic diarrhea," both related to King's Crohn's disease, his medical history was noted to be essentially negative, except for "some

---

[3]  Thrombocytosis is a disorder in which the body produces too many blood platelets. The disorder is known as reactive thrombocytosis when it is caused by an underlying condition. See http://www.mayoclinic.org/diseases-conditions\thrombocytosis (last visited Feb. 3, 2014).
[4]  Hypokalemia refers to lower than normal levels of potassium in the bloodstream. Normal blood potassium level ranges from 3.6 to 5.2 millimoles per liter. http://www.mayoclinic.org/symptoms\low-potassium\basic (last visited Feb. 3, 2014).

history of depression and anxiety." (Tr. 225-226). Bone marrow testing led Dr. Webb to conclude that King's thrombocytosis and leukocytosis "were most likely reactive on the basis of his underlying Crohn's disease." (Tr. 220).

In addition to treatment by Drs. Volk, Sparks and Webb, King also received ongoing treatment from Dr. Michael Greenwell (Tr. 332-42, 343-53, 354-63, 364-450). The treatment records of Dr. Greenwell, of Gastro East Physicians, reflect that in September of 2007, King reported to the doctor that he had been on Colazal for about three years and that it "works pretty well." (Tr. 239). Fast food and greasy foods, according to King, caused him problems (Id.). He reported no abdominal pain to Dr. Greenwell on that occasion, and physical exam showed him to be well developed and well nourished (Tr. 339).

That October, King reported to Dr. Greenwell that he was feeling "up and down" and experiencing loose stools (Tr. 338). Treatment notes reflect that King reported he had used Remicade infusions in the past "with effect." (Id.). In November, Dr. Greenwell re-initiated Remicade after King reported that he was experiencing Crohn's symptoms "50% of the time." (Tr. 337). Once again, King experienced significant improvement. In January of 2008, he showed increased weight and reported that he was "better than before with less frequent bowel movements and no abdominal pain." (Tr. 336). His medications on that occasion continued to be Colazal and Prilosec.

King returned to Dr. Greenwell in mid-February of 2008, for a 6-week follow-up. On that occasion, King denied any abdominal pain, reported that he had normal bowel movements, and told the doctor that he was "feeling much better," although he did note some reoccurrence of symptoms. (Tr. 335). Dr. Greenwell continued King on his current medications of Colazal, Protonix along with Remicade (Id.).

Two months later on April 7, 2008, King returned to Dr. Greenwell for a further follow-up. (Tr. 334). The two discussed King's Remicade treatments, which King reported lasted about 6 weeks. Dr. Greenwell consequently increased the frequency of the Remicade treatments to every 6 weeks from every 8 weeks and scheduled a follow-up visit in three months (Tr. 334). On June 11, 2008, King reported to Dr. Greenwell that he was having a reaction to the Remicade and felt dizzy and nauseous (Tr. 333). King reappeared at Dr. Greenwell's office three months later in September of 2008 (Tr. 389). At that time, King reported that the Remicade was "making him feel much better" although he still had some dizziness and dyspepsia[5] (Tr. 389). Treatment notes reflect that King's appetite was good and that he had "no breakthrough symptoms" on the 6-week Remicade regimen. His weight was noted to be 179 lbs, an 8-lb. increase over the 3-month interval (Id.).

On Jan. 7, 2009, King reported to Dr. Greenwell that he had experienced "mild flares between doses of Remicade." (Tr. 390). Treatment notes reflect King's bowel pattern changes to be "insignificant." Unfortunately, in April of 2009, when King returned for his regular 3-month follow-up, he reported to Dr. Greenwell that, although his Remicade treatment lasted about 6 weeks, he was taking Prednisone in between treatments "to hold him over" and was having loose stools, abdominal tenderness, fatigue, decreased appetite and nausea (Tr. 391). Matters improved somewhat the following month in May of 2009, when King reported no abdominal pain and only nausea. Treatment notes, however, reflected a 4-lb. weight loss in the 7-week intervening period (Tr. 396).

---

[5] Dyspepsia is "mild discomfort in the upper belly or abdomen. It occurs during or right after eating." http:\\www.nim.nih.gov\medlineplus\ency\article\003260.htm (last visited Feb. 3, 2014).

King was continued on medication and did not return until his next scheduled 3-month follow-up in August of 2009. At that time, treatment notes reflect no reports of nausea or reflux and a weight gain of 3 lbs (Tr. 397). Dr. Greenwell's handwritten notes indicate King was "tolerating meds." (Id.). His medications on that occasion were noted to be potassium, 20 mg., folic acid, 1 mg., Protonix, 40 mg., Benazepril, 12 mg., Lexipro, 10 mg., Colazel, 750 mg., and Remicade (Tr. 398).

King did not return to Dr. Greenwell until Feb. 24, 2010, for a 6-month follow-up examination. His weight on that occasion had increased by 2 lbs. to 182 lbs (Tr. 399). King nonetheless reported that his last dose of Remicade had "not much effect." Dr. Greenwell therefore increased King's Remicade dosage (Tr. 399).

Dr. Larry Martin of Baptist Medical Associates also provided treatment to King from mid-February 2008, to March of 2010 (Tr. 451-488). Dr. Martin acted as King's primary care physician since February of 2008, with Dr. Greenwell treating King for his Crohn's disease (Tr. 456). Dr. Martin related a history of hypertension and generalized anxiety, which he treated with Lotensin HCT 20, 1 per day, and Citalopram, 40 mg. daily (Id.). Blood tests performed on King in February of 2009, revealed a normal blood sugar, normal kidney function and normal potassium levels (Tr. 459). Dr. Martin concluded that no change in King's medication was then required (Id.). These blood test results were in accordance with earlier such results obtained in April and August of 2008 (Tr. 461, 465). Dr. Martin documented King's history of elevated blood pressure and white blood count (Tr. 468-469).

Dr. Greenwell in May of 2010, provided King with a jury excuse letter (Tr. 530). The letter, written to "Whom It May Concern," related King's diagnosis of Crohn's disease in 1994, his use of anti-inflammatory medication and "break through symptoms." (Id.). Based on these

factors, Dr. Greenwell offered the opinion in the letter that King "may not be a good candidate to serve on jury duty at this point in time because of his Crohn's disorder and his inability to sit for any prolonged period of time."  (Id.).  The letter provided no indication of the specific time duration included within a "prolonged period of time," nor did it specify the nature of the break through symptoms.

Ten months later on March 9, 2011, King was involved in a single vehicle accident (Tr. 537-41).  According to the U of L emergency department treatment records "the accident involved a low impact velocity and resulted in mild damage to the patient's vehicle."  (Tr. 537).  ER records indicate that King was "ambulatory at the scene" and that "the airbag did not deploy" nor did King's vehicle overturn.  A review of his systems at that time indicated no nausea, dizziness, chest pain, difficulty breathing, headache or abdominal pain, and no lacerations or vomiting.  (Id.).  X-rays of the thoracic and lumbar spine, along with the chest, were noted to be negative (Tr. 538).  King remained stable on admission and denied any abdominal pain, although he did have pain in the left arm that improved "with only mild, diffuse heaviness while holding it [the arm] straight."  (Tr. 539).  King was noted to be in good condition upon his discharge.

Hospital ER treatment records indicate that King was subsequently diagnosed with a cervical fracture (Tr. 551-52).  He was prescribed Lortab, 5 mg. every 4-6 hrs, along with a cervical collar (Id.).  A CT scan of the cervical spine on March 29, 2011, some three weeks after the accident, revealed an acute fracture of the left superior facet at C7 with anterior displacement along with vertebral lucency at the left C6 facet, potentially indicative of an additional facture accompanied by mild anterolisthesis of theC6 relative to the C7 (Tr. 554).

The following month on April 29, 2011, King underwent an MRI cervical spine imaging as a follow-up to his CT scan of the cervical spine the prior month (Tr. 566-567).  The MRI

report indicates a history of continued neck pain and left upper extremity radicular symptoms following King's motor vehicle accident six week earlier (Tr. 566).  The MRI image showed a 50% loss in the anterior vertebral body height within the T2 vertebrae consistent with a subacute wedge compression deformity of the T2 (Id.).  Otherwise, the remainder of the vertebral bodies appeared to be "of normal height and signal."  The report indicated some disk desiccation at the C6-C7 along with an increased signal involving the facet joint on the left of theC6-C7 consistent with a known facture.  It also showed bone spurring with mild to moderate neural foraminal narrowing at the C3-C4 along with bone spurring and moderate neural foraminal narrowing at the C4-C5 and C5-C6.  Otherwise, King's cervical cord appeared unremarkable (Tr. 567).

  As a result of this imaging, Dr. Joseph Finizio, a neurosurgeon, recommended that King wear a cervical collar for three months based on the imaging and King's complains of neck pain and occasional numbness/tingling down his left arm (Tr. 569-570).  Dr. Finizio indicated in his report of May 3, 2011, that if any signs of instability developed in King's C6-C7, "he will need a fusion and decompression at the C6-7."  (Tr. 569).

  King testified concerning the impact of his Crohn's disease and cervical fracture at the video hearing on Jan. 24, 2012 (Tr. 38-56).  King generally discussed his history of bowel disease and his motor vehicle accident-related symptoms (Tr. 40-42).  He acknowledged on questioning by the ALJ that he has not experienced substantial weight loss (Tr. 41).  King explained that his Remicade treatment every six weeks "helps speed up the process of my food digesting."  (Id.).  The in-home Remicade treatment, however, does make King tired and sluggish.  (Id.).  He essentially requires an entire day to recover when he has a treatment.  (Id.).

  King estimated that he would miss four days of work per week due to the Crohn's-related symptoms he experiences (Tr. 42).  These symptoms include two-to-four bowel movements in

the morning, accompanied by abdominal pain and nausea (Tr. 42-43). He acknowledged that his problems with vomiting have "cut back a lot," but he continues to have frequent bowel movements (Tr. 44). King estimated that he has an urgent need to defecate 4-5 times a day (Id.). In an 8-hour workday, King estimated he would need to so relieve himself 3 or 4 times. (Id.).

Due to his cervical fracture, King explained that he cannot completely rotate his neck (Tr. 45). He also experiences numbness in two fingers of his left hand, but due to a lack of medical insurance, he has not been able to return to Dr. Finizio (Id.). His left hand, according to King, remains numb all the time and he has difficulty holding heavy objects with the hand (Tr. 45). King estimated that he could move a rocking chair or run a vacuum cleaner (Tr. 46). He acknowledged that he does do housecleaning when he feels capable of doing so (Id.).

King testified at the request of the ALJ about his "stroke." (Tr 47-49). He explained that he had a history of high blood pressure that was misdiagnosed initially and resulted in him experiencing a blackout and a seizure that caused him to temporarily lose sight in his left eye (Tr. 48). King related that on that occasion he drove himself to the hospital where he collapsed upon arrival (Id.). When he awoke in the ER, King allegedly was told by an unnamed hospital employee that he had experienced "a mild stroke." (Id.). After this incident, he was placed on an effective blood pressure medication and his blood pressure stabilized, but King "still can't see good out of [his] left eye." (Id.).\

King conceded that none of his doctors has told him that he had experienced a stroke based on a review of his hospital records, but he continues to be treated by an eye specialist who has advised King that the vision in his eye was affected by the incident (Id.). King explained that he is now sensitive to sunlight exposure in his left eye as a result (Tr. 49). He must avoid bright light outdoors.

As for his motor vehicle accident, King related that he had been told by his doctor if his neck did not "fuse back together," he would have to have surgery (Tr. 49). King acknowledged that he is not currently under treatment for his condition and has not received physical therapy or any specific medication for his neck problems (Tr. 49-50). King explained that he is unable to take pain medication due to his stomach problems, which not only require a Remicade treatment every six weeks, but also requires him to take 9 Colazal pills each day as well as Prednisone (Tr. 51).

When King has a "flare up" of his Crohn's symptoms, he will have stomach pain, urgent bowel movements and a greatly reduced energy level (Tr. 51). His neck problems separately make it difficult for King to lower his head to look downward (Tr. 53). Otherwise, his primary symptoms include continuing abdominal pain and daily headaches that limit his ability to be outside on sunny, or "beautiful," days as King describes them (Tr. 54-55). King estimated that he experiences such headaches approximately 20 days a month (Tr. 55).

Vocational expert Jo Ann Bullard testified that King's past relevant work as a warehouse laborer was medium, unskilled work. Assuming that King were limited to light exertional work with occasional posture activities and could only reach, handle or finger with his left hand no more than frequently. Bullard concluded that with those limitations he would still remain capable of performing alternative, light, unskilled work in jobs such as housekeeping cleaner, laundry folder and cashier (Tr. 57-58). If King were required to miss 3 or more days a week and were limited to only occasional use of the left arm and hand, then Bullard concluded that King would be unable to perform the alternative work she identified or any other jobs (Tr. 58-59).

Based on this testimony by VE Bullard, along with King's age, education, work experience and a residual functional capacity for a limited range of light work, ALJ Siegel

ultimately concluded that King has not been under a disability as defined by the Social Security

Act from his alleged onset date of Aug. 27, 2006, through the date of ALJ Siegel's decision on

Feb. 7, 2012 (Tr. 26-27).


**Legal Issues Raised.**

King begins his fact and law summary with an argument related to the testimony of the

vocational expert, Jo Ann Bullard (Tr. 57-60).  King argues that his case must be remanded

because the ALJ overlooked Social Security Ruling SSR 00-4p and *Lindsley v. Comm'r*, 560

F.3d 601, 603, 606 (6th Cir. 2009).  According to King, *Lindsley* and SSR 00-4p required ALJ

Siegel to ask Bullard if the vocational information she provided at the hearing conflicted with the

information contained in the Dictionary of Occupational Titles (DOT).  King insists that the

language of SSR 00-4p imposes an affirmative duty on the ALJ to ask about any possible

conflict of that nature.  The ALJ must determine, first if such a conflict exists between the VE's

testimony and the DOT, and second, if so, whether a reasonable explanation exists for the

apparent conflict (DN 14, p. 2).  While the hearing decision of the ALJ at p. 8 does state that

"pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is

consistent with the information contained in the [DOT]," King argues that this finding is not

appropriate as the authority to make such a finding is vested exclusively in the vocational expert

under 20 C.F.R. §404.1566(e) and SSR 00-4p.

For several reasons, the Court cannot accept King's initial argument.  First and foremost,

King has not established the existence of any conflict between the testimony of vocational expert

Bullard and the DOT in the first instance.  The VE in her testimony did not cite to or otherwise

rely upon any specific section of the DOT, which the Commissioner correctly notes is not the

sole source of job information.  See 20 C.F.R. §§ 404.1566(d), (3); 416.966(d), (e); *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994) ("It would be manifestly inappropriate to make the [DOT] the sole source of evidence concerning gainful employment.").  Further, examination of the relevant portion of SSR 00-4p indicates that only "when vocational evidence provided by a [VE] or vocational specialist is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the [VE] or vocational specialist's evidence to support a determination or a decision that an individual is not disabled."  SSR 00-4p, 65 Fed. Reg. 75759, 75760 (2000).

Careful examination of the *Lindsley* decision also confirms the Court's view that King's argument is unpersuasive.  *Lindsley* involved a case in which the claimant argued that the decision of the ALJ was not supported by substantial evidence "because the testimony of the vocational expert conflicted with the information found in the DOT."  *Lindsley*, 560 F.3d at 602. In explaining the provisions of SSR 00-4p, the Sixth Circuit noted that on occasion the testimony of the VE will conflict with the information set forth in the DOT.  *Id*.  Accordingly, "in an effort to ensure that such actual or apparent conflicts are addressed, the Social Security Administration has imposed an affirmative duty on ALJs to ask the VE if the evidence that he or she has provided 'conflicts with [the] information provided by the DOT.'"  *Lindsley*, 560 F.3d at 603 (citing SSR 00-4p, 2000 WL 1898704 at *4).

*Lindsley* continues to add that an ALJ must "obtain a reasonable explanation for … 'apparent conflicts if the VE's evidence 'appears to conflict with the DOT.'"  *Id*.  Accordingly, it is only in the presence of an apparent conflict that any affirmative duty to resolve such a conflict exists.  In other words, when the VE does not rely on the DOT, or no other indication of an apparent conflict between the testimony of the VE and the DOT exists, then a failure of the ALJ

to inquire to resolve an otherwise nonapparent, and perhaps nonexistent, conflict will not require remand. Certainly, *Lindsley* does not indicate that in the absence of an apparent conflict failure to question the VE in this fashion is automatically cause for remand.

Indeed, it was the failure of the claimant in *Lindsley* to identify any apparent, much less actual, conflict between the DOT and the testimony of the VE therein that caused the Sixth Circuit to reject the same argument that King now raises. As the Sixth Circuit explained in *Lindsley*:

> But Lindsley has not identified any apparent, let alone actual, conflict between the DOT and the testimony of VE Breslin. Instead, Linsdsley repeatedly emphasizes that the occupations listed in the DOT do not include the job description of a "light, unskilled production inspector." Lindsley has failed, however, to cite any authority establishing that a conflict between the DOT and a VE's testimony exists simply because an occupation described by the VE does not specifically appear in the DOT.

*Lindsley*, 560 F.3d at 605.

The same type of fatal deficiency is present in King's case. Nowhere does King identify any actual or apparent conflict between the testimony of VE Bullard and the DOT, which Bullard did not refer to in her testimony at the hearing in any event. Given the absence of an apparent or actual conflict, the failure of the ALJ to ask VE Bullard about the possible existence of a hypothetical conflict is not error that would require automatic remand. Rather, at worst, assuming that the ALJ's failure to ask was error at all, it would be harmless error. *See Austin v. Comm'r*, Case No. 3:9-CV-723, 2010 WL 1170630 at *3 (N.D. Ohio Mar. 23, 2010) (noting that in *Lindsley* there was no conflict between the VE's testimony and the DOT, while continuing to hold that, even in the existence of a conflict, the failure of the ALJ to resolve the conflict may be harmless error when the VE identifies other positions the plaintiff remains capable of performing that do not conflict with the DOT). *See also, Renfrow v. Astrue*, 496 F.3d 918, 920-21 (8th Cir.

2007) (failure of the ALJ to ask the VE whether his testimony conflicted with the DOT was harmless error where no conflict existed).

Further, as the Commissioner points out, several federal decisions have rejected the notion that the failure of the ALJ, in the abstract, to inquire of the VE whether any potential conflicts exist between the jobs identified and the DOT, requires an automatic remand.  *See Boone v. Barnhart*, 353 F.3d 203, 206 (3rd Cir. 2003) (declining to accept that such an unexplained conflict automatically requires reversal); *Brown v. Barnhart*, 408 F.Supp.2d 28, 35 (D.D.C. 2006) ("Even if SSR 00-4p places an affirmative due on the judge, such a procedural requirement would not necessarily bestow upon a plaintiff the right of automatic remand where the duty was unmet.").  Here, where no actual or apparent conflict has been identified, and the VE did not rely upon the DOT in her testimony, the mere failure of the ALJ to inquire in the abstract about the potential for an otherwise nonapparent inconsistency between the VE's testimony and the information contained in the DOT was harmless error at the very worst, if error at all.

King focuses the remainder of his fact and law summary on finding of fact no. 5 of ALJ Siegel's hearing decision (Tr. 22-25).  In this finding, the ALJ determined that King, despite his impairments, retains the residual functional capacity (RFC) to perform a limited range of light exertional work with only frequent reaching, handling or fingering with the left hand, and occasional postural activities (Tr. 22).  King now contends that this finding is not supported by substantial evidence.  In particular, he challenges the observation of ALJ Siegel that "the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual."  (Tr. 23).

King asks exactly what is "the type of medical treatment one would expect" for an individual such as himself, who has medical records that undeniably establish a lengthy history of treatment for Crohn's disease (DN 14, p. 4). He challenges the notion, set forth by ALJ Siegel in his hearing decision, that his treatment in this respect has been "essentially routine and/or conservative in nature." (Tr. 23). King points out that the severity of his Crohn's disease requires that he be infused with Remicade every six weeks, a process that requires an IV infusion taking three hours, which is administered in his home by a nurse (DN 14, p. 4).

King cites the Physican's Desk Reference (PDR), p. 904-05, Sixth Edition, 2011, which indicates that intravenous Remicade treatment is administered to those patients with moderate to severe Crohn's disease who have not otherwise responded adequately to more conventional therapy. He also points out that the same section of the PDR notes that typical adverse reactions to such Remicade treatment include the very same type of headaches and abdominal pain that he complained of in both his testimony and in his medical records (Tr. 43, 54-56). Accordingly, King concludes that certainly an objective basis exists for his subjective complaints of both headache and abdominal pain, and Remicade is exactly the type of aggressive treatment, as noted in the PDR, that one might expect a totally disabled person to receive, contrary to the ALJ's unsupported conclusion otherwise (DN 14, p. 5).

King continues to describe in detail his treatment records with gastroenterologist Dr. Greenwell (DN 14, pp. 5-7). Specifically, he focuses on Dr. Greenwell's treatment note of November 2007, when King reported that he was symptomatic 50% of the time (Tr. 337). King notes that following a brief period of stabilization, he began to experience flare-ups with his Crohn's disease beginning in 2009 (Tr. 362). These flare-ups required not only Remicade infusions every six weeks, but medication with Prednisone in between the infusions to address

complaints of fatigue, abdominal pain, nausea, decreased appetite and diarrhea three to four times a day (Tr. 361). King notes that in February of 2010, his Crohn's appeared to be worsening such that his Remicade was increased and a Medrol dose pack was noted to provide little relief from his complaints of bowel movements 5-6 times a day (Tr. 365). These complaints led to Dr. Greenwell's jury excuse letter concerning King's inability to sit for prolonged periods of time (Tr. 530). King notes that as late as August 2010, he still complained of such gastrointestinal symptoms despite his continuing treatment with Remicade (Tr. 529).

Given this medical history, King insists that ALJ Siegel erred in his reliance upon the opinion of one-time, consultative medical examiner Dr. Carter and in giving great weight to Dr. Carter's assessment of King's RFC (Tr. 24). King argues that the substance of Dr. Carter's medical report indicates that the doctor was uncertain as to the purpose of King's IV infusion treatment with Remicade and Prednisone (Tr. 503). Further, Dr. Carter did not have access to Dr. Greenwell's records, nor did the doctor perform any objective medical testing, such as an endoscopy (DN 14, p. 6). Accordingly, King insists that the ALJ's reliance on Dr. Carter's opinion was "unfounded." (Id., p. 7). King's hearing testimony, in his own view, is entirely consistent with the endoscopy and laboratory results obtained in the ongoing treatment of his Crohn's disease, not the findings of Dr. Carter, who did not even know specifically why King had been prescribed Remicade and Prednisone (Id.).

King argues finally that he still experiences constant numbness in the fingers of his left hand, which causes him to have difficulty manipulating objects, along with trouble turning his neck (Tr. 45). To complicate matters, due to his Crohn's disease, King is unable to orally take pain medication for his neck injury due to his stomach problems (Tr. 50). The objective medical evidence, King notes, confirms his acute fracture of the C7 vertebra with anterior displacement,

along with multi-level spurring of the cervical vertebrae and neural foraminal narrowing throughout the cervical spine most prominent at C3-4 (Tr. 551-55, 566-77). King also has been diagnosed by Dr. Finizio with cervical radiculopathy and an MRI of the cervical spine confirms a T2 compression fracture and C7 facet fracture. Accordingly, King insists that his testimony at the hearing was entirely consistent with the objective medical findings so that substantial evidence does not support the denial of his claim for benefits.

**Finding of Fact no. 5**

Upon consideration of King's well-drafted arguments, the Court is compelled to conclude that substantial evidence does support the RFC determination of ALJ Siegel in finding no. 5. Residual functional capacity is defined by regulation as being "the most you can still do despite your limitations." 20 C.F.R. §§404.1545(a)(1), 416.945(a)(1). *See Luteyn v. Comm'r of Soc. Sec.*, 528 F. Supp.2d 739, 750 (W.D. Mich. 2007) ("RFC is the most, not the least, a claimant can do despite his impairments."). The Commissioner is required by regulation to assess a claimant's RFC "based on all the relevant evidence in [the claimant's] … record." *Id*. *See Bingham v. Comm'r*, 186 Fed. Appx. 624, 647-48 (6th Cir. 2006) ("The ALJ is ultimately responsible for determining a claimant's RFC based upon relevant medical and other evidence of record.").

In assessing a claimant's residual functional capacity, the Commissioner will consider all of his or her medically determinable impairments including both severe and non-severe impairments. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). *See Reynolds v. Comm'r* , 424 Fed. Appx. 411, 417-18 (6th Cir. 2011) ("It is true that an ALJ must determine a claimant's residual functional capacity, considering 'numerous factors' including 'medical evidence, non-medical

evidence, and the claimant's credibility.'") (quoting *Coldiron v. Comm'r*, 391 Fed. Appx. 435, 443 (6th Cir. 2010)). See also, SSR 96-5p, 1996 WL 374183 at *3 (July 2, 1996). It is the responsibility of the claimant to provide the evidence that the Commissioner will evaluate in making the RFC finding. See 20 C.F.R. §§404.1512(c), 416.912(c). The Commissioner also will consider any statements of the claimant provided by medical sources about what he or she remains able to do, as well as any descriptions or observations of the claimant's limitations caused by his or her impairments that are provided by the claimant, the claimant's family, friends or other persons. 20 C.F.R. §§405.1545(a)(3), 416.945(a)(3).

A finding of residual functional capacity is used at step 4 of the sequential evaluation process first to determine whether the claimant remains capable of performing his or her past relevant work. See 20 C.F.R. §§404.1520(f), 404.1560(b), 416.920(f) and 416.960(b). If the Commissioner determines that a claimant is not able to perform his or her past relevant work, or does not have past relevant work, then the RFC determination is used at step 5 of the sequential evaluation process to determine whether the claimant can adjust to any other work that exists in the national economy. See 20 C.F.R. §404.1520(g), 404.1566, 416.920(g) and 416.966. In this respect, the RFC assessment is used along with information concerning the claimant's vocational background in making the disability determination. *Id.*

A review of the relevant medical and other evidence persuades the Court that the ALJ properly considered and weighed such evidence along with the opinions of treating physician Dr. Greenwell and consultative medical examiner, Dr. Carter (Tr. 50-04, 530). Dr. Carter, who examined King on April 24, 2010, found no evidence of wasting due to Crohn's disease and the objective medical evidence contains no such evidence(Tr. 502). While King related a prior stroke event, Dr. Carter likewise found no evidence to support any end-organ damage in physical

examination (Tr. 503). The cited medical records discussed above likewise indicate no end organ damage. King exhibited a normal gait during examination by Dr. Carter and had no impairment in his range of motion (Id.). His blood pressure was normal, as were his reflexes and peripheral strength (Id.). Accordingly, Dr. Carter's examination results are fully supportive of his opinion that King remained able to tolerate light activity, including lifting and carrying light objects (Tr. 504).

Indeed, Dr. Carter's opinion on consultative medical examination is consistent with the medical evidence of record as a whole. See gen., 20 C.F.R. §§ 404.1527(c)(4), 16.927(c)(4). For example, King's range of motion in the neck and extremities was noted to be good in August of 2007, well prior to his subsequent automobile accident in March of 2011. Immediately following that accident, ER examination notes indicate that King had a normal range of motion in his back with no focal neurological deficits (Tr. 537-38). At most, he exhibited mild tenderness in the lower left arm, but otherwise had normal reflexes without sensory deficits (Id.). Subsequently, in the following months after King's accident, Dr. Finizio likewise noted that King exhibited normal 5/5 strength in his hands and arms and had pinprick sensation in all of his dermatomes.[6]

As for the jury excuse letter prepared by Dr. Greenwell in May of 2010, ALJ Siegel properly characterized the contents of the letter as being "tepid." Nowhere in the letter does Dr. Greenwell set forth limitations that would preclude the alternative employment as identified by the vocational expert (Tr. 24, 530). The letter does not provide any indication of what Dr. Greenwell believes constitutes a "prolonged period of time." (Id.). Further, it mentions no other

---

[6] Dermatome is defined to be the area of the skin supplied with afferent nerve fibers by a single posterior spinal root. http:\\medical-dictionary.thefreedictionary.com\dermatome (last visited Feb. 5, 2014).

restrictions concerning the performance of basic work activities, and is temporally limited to "this point in time." (Tr. 530). Given that the letter was drafted specifically with the purpose to excuse King from jury duty, the ALJ was understandably inclined to afford the letter less weight. See 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion."). At most, the jury excuse letter makes reference to King's Crohn's disease and his need for anti-inflammatory medications without providing any specific details as to the nature or frequency of "break through symptoms" that might render King "not to be a good candidate to serve on jury duty at this point in time…." (Tr. 530). Accordingly, the Court cannot conclude that ALJ Siegel erred in the weight he afforded to the jury excuse letter.

The Court further concludes that the ALJ did not err in refusing to reject the opinion of consultative medical examiner Dr. Carter based on the doctor's statement that '[King] … notes a history of rheumatoid arthritis and is on Remicade and Prednisone, it is unclear if he is on [these medications] for specifically the rheumatoid or additionally for Crohn's." (Tr. 503). It appears that King, who was relating his treatment history to Dr. Carter, was himself unclear as to whether the Remicade was specifically for the one condition or the other, rheumatoid arthritis or Crohn's disease, or both conditions. While Dr. Carter may not have had access to King's complete medical records, his examination of King nonetheless was fully supportive of the very minimal functional limitations that he assessed. See 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6). Accordingly, it cannot be said that ALJ Siegel erred in his conclusion that the determination of Dr. Carter was credible and adequately supported.

We turn next to King's testimony concerning his subjective complaints. ALJ Siegel in his hearing decision concluded that, while King's medically determinable impairments could be

expected to cause some of his symptoms as alleged, his statements concerning the intensity, persistence and limiting effects of the symptoms were not fully credible (Tr. 24).  ALJ Siegel also specifically noted in his credibility determination King's testimony concerning an alleged stroke that occurred in the summer of 2008, which was unsupported by the medical records, along with King's testimony that he experienced photosensitivity that precluded him from being outside 365 days a year, or 20 workdays a month.  ALJ Siegel specifically stated in his hearing decision, "I cannot find the claimant's allegations fully credible."  (Tr. 25).

The law is well established that an administrative law judge properly may consider the credibility of a claimant when evaluating the claimant's subjective complaints, and the federal courts will accord "great deference to that credibility determination."  *Warner v. Comm'r*, 375 F.3d 387, 392 (6th Cir. 2004).  The standard in the Sixth Circuit for evaluating subjective complaints, such as complaints of pain for example, was established in *Duncan v. Sec'y of H&HS*, 801 F.2d 847, 853 (6th Cir. 1986).  *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (setting forth the *Duncan* standard).

Under *Duncan*, the Court first determines whether objective medical evidence of an underlying medical condition is present in the record.  *Id*.  If so, then the Court will examine whether such evidence confirms the severity of the claimant's subjective symptoms related to the condition, or whether the objectively established medical condition itself is of sufficient severity that it can be reasonably expected to produce the alleged subjective symptoms, such as disabling pain.  *Id*.  The findings of the ALJ in this regard are repeatedly held in the Sixth Circuit to be accorded great weight and deference given the ability of the ALJ to observe the demeanor and credibility of the witnesses.  *Walters v. Comm'r*, 127 F.2d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y*, 818 F.2d 461, 463 (6th Cir. 1987)).  Yet, the ALJ is not accorded absolute

deference and his or her assessment of a claimant's credibility must be supported by substantial evidence. *Beavers v. Sec'y*, 577 F.2d 383, 386-87 (6th Cir. 1978).

When the ALJ "finds contradictions among the medical reports, claimant's testimony and other evidence," the ALJ may properly discount the credibility of the claimant. *Winning v. Comm'r*, 661 F. Supp.2d 807, 822 (N.D. Ohio 2009) (citing *Walters*, 127 F.3d 525, 531 (6th Cir. 1997)). The ALJ, however, is not permitted to render a credibility determination based solely upon a hunch, or "intangible or intuitive notion about an individual's credibility." *Id.* (citing *Rogers*, 486 F.3d at 247) (citing SSR 96-7p)). Under SSR 96-7p, the ALJ must in the hearing decision set forth specific reasons for the credibility determination sufficient to make clear to the claimant and subsequent reviewers the weight that the ALJ gave to the claimant's statements and the reasons for such weight. *Winning*, 661 F. Supp.2d at 823. A mere blanket assertion that a claimant is not believable will not be sufficient under SSR 96-7p. *Id.* (citing *Rogers*, 486 F.3d at 248).

An assessment of the claimant's credibility must be based on a consideration of all the evidence of record. It should include consideration of not only the objective medical evidence but the following factors as well: (1) the daily activities of the claimant; (2) the location, duration, frequency, and intensity of the claimant's symptoms including pain; (3) any factors that precipitate or aggravate the symptoms; (4) the dosage, type, effectiveness and side effects of any medication taken to alleviate such symptoms or pain; (5) treatment that the claimant has received for relief of his or her symptoms; (6) any measures other than treatment that the claimant uses to relieve his or her symptoms; and (7) any other factors relating to the functional limitations and restrictions of the claimant due to such symptoms or pain. *Id.* at 823 n. 14 (citing SSR 96-7p). Also included among the evidence that the ALJ must consider are the medical signs and

laboratory findings of record, the diagnosis, prognosis and medical opinions provided by any treating physicians or other medical sources, and any statements or reports from the claimant, physicians or other persons about the claimant's medical history, treatment, response to treatment, prior work record, daily activities and other information related to the symptoms of the claimant and how such symptoms affect his or her ability to work.  *Id*.

When the record establishes consistency between the subjective complaints of the claimant and the other evidence of record, such consistency will tend to support the credibility of claimant, while in contrast, any inconsistency in this regard will tend to have the opposite effect. *Winning*, 661 F. Supp.2d at 823.  The reviewing court does not make its own credibility determinations.  *Franson v. Comm'r*, 556 F. Supp.2d 716, 726-27 (W.D. Mich. 2008) (citing *Walters*, 127 F.3d at 528)).  The federal courts will not substitute their own credibility determination for that of the ALJ as the fundamental task of the Commissioner is to "resolve conflicts in the evidence and to decide questions of credibility."  *Rineholt v. Astrue*, 617 F. Supp.2d 733, 742 (E.D. Tenn. 2009) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).  Given the substantial deference accorded the credibility determination of the Commissioner, "'claimants challenging the ALJ's credibility determination face an uphill battle.'"  *Franson*, 556 F. Supp.2d at 726-27 (citing *Daniels v. Comm'r*, 152 Fed. Appx. 485, 488 (6th Cir. 2005)).

ALJ Siegel's hearing decision adequately sets forth a substantial basis for his adverse credibility determination concerning King's objective complaints.  Review of the objective medical evidence from the treatment records rules out any indication that King suffered a stroke as he testified.  Instead, an MRI of King's brain in July of 2007, and a CT scan in August of that year both were within normal limits (Tr. 226, 308).  No treating physician found any indication

that King had suffered a stroke as he testified.  Further, while King undeniably suffers from Crohn's disease, the medical records indicate substantial periods during which King expressed minimal subjective symptoms (Tr. 351, 374).

For example, a colonoscopy in October 2007, revealed only mild inflammation (Tr. 340).  King likewise expressed initial satisfaction with the results obtained by his Remicade treatments.  Dr.Greenwell's treatment notes from January of 2009 indicate only "mild flares" between such treatments (Tr. 362).  King reported in August of 2009, that he was tolerating his medications well and had only two bowel movements per day (Tr. 356).  King's treatment records reflect no wasting or other substantial weight loss during this entire time.  In fact, King was reported in February of 2010, to be 182 lbs, which in Dr. Carter's view, rendered him overweight (Tr. 355, 501).  In May of 2011, King's reported weight remained 180 lbs., which indicates the stability of his condition, as well as its nondisabling nature.

The exaggerated nature of King's hearing testimony concerning the frequency and severity of his headaches is revealed in his medical records.  In May of 2007, King complained of headaches, but he then reported only that they caused him to lose approximately 4-8 hours of working time (Tr. 318).  The records reflect no mention of any daily headaches of a debilitating nature.  Further, following King's motor vehicle accident, when he was examined by Dr. Finizio in 2011, the doctor's treatment notes reflect no complaints of such severe headaches.  (Tr. 569-71).

As the Commissioner notes, King's activities of daily living further support the credibility of the determination of ALJ Siegel.  See 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i).  King indicated in his adult function report that he can prepare his own meals, mow the lawn, drive an automobile, shop for groceries, attend movies, visit with family and raise

a puppy (Tr. 179-182). King's hearing testimony likewise confirmed that he is able to perform housework, as well (Tr. 46). Such daily activities undermine King's argument that his functional limitations exceed those determined by the ALJ, and are fully supportive of the ALJ's credibility determination concerning King's subjective symptomology.

The nature of King's ongoing treatment for his Crohn's disease also is fully supportive of the ALJ's credibility determination. Review of the record reveals that King tolerated the medical treatment well, and it was largely effective in reducing his symptoms. King's Remicade treatment every six weeks was reported by him to speed up his digestive process, to help with his arthritis, and at least initially, to made him "feel like a fountain of youth." (Tr. 41). King was maintained adequately between his 6-week Remicade treatments with medication of Colazal pills and Prednisone (Tr. 41, 50-51).

While King did on occasion experience flare-ups between Remicade treatments, the flare-ups primarily were characterized as being mild (Tr. 390). King's stable, above average weight, likewise is indicative of successful treatment. Regardless of whether one characterizes such treatment as being "conservative" or "aggressive," the material question, apart from either characterization, is whether the treatment was effective in restoring the patient's functioning and in the reduction of his or her symptoms. King's treatment appeared to be successful on both accounts. Consequently, ALJ Siegel did not err in his decision to reject King's credibility as to the persistence and intensity of his symptoms and limitations. Substantial evidence supports the credibility determination of ALJ Siegel in this regard.

Ultimately, the Court concludes that substantial evidence supports the adverse disability determination of the Commissioner. The ALJ posed a hypothetical question to the vocational expert that accurately portrayed King's limitations. Faced with this hypothetical, the VE

identified alternative jobs that exist in substantial numbers in the national and state economy that King remains capable of performing, given his age, education, past relevant work and RFC.  The Commissioner therefor properly rejected King's claim at step 5 of the sequential evaluation process.  *See Varley v. Sec'y of HHS*, 820 F.2d 777, 779 (6th Cir. 1987).  The Court shall enter a final order that affirms the decision of the Commissioner.

Cc:     Counsel of Record